number 16 2 0 7 2 0. Mr. Watt. Judge Jones, Judge Smith, Judge Cordova. I represent Elsa Rodriguez. The case is a First Amendment case and a 14th Amendment case. The issues that you're going to be confronted with are, first of all, whether or not then-Superintendent Terry Greer was a policymaker for the Houston Independent School District. I believe that he was, and I believe that the reasons that he was are attached to my response to the 12b-6. First of all, I wanted to say, though, before going into any of the argument any further, that at Jefferson Elementary School, although counsel points out that there were 19 teachers who were apparently accused, of those 19, there was no testing irregularities found at Jefferson. And that the only time that, at the end of the day, that Greer, Superintendent Greer, attempted to justify the investigation and his actions in there, he said that researchers, this on public radio, researchers agreed that the 30% increase in grades on the STAR test was improbable. It was pointed out that HISD's own record showed that there, in fact, had been a 4.5% decline in grades, and not the 30% increase. Let me just ask you, what is your client seeking? Well, what my client is seeking. Because she was injured. She came back to school. Then she was put on administrative, moved to another post administratively until the investigation was completed. And then she was exonerated. In terms of exoneration, Judge, the records of HISD, even today, even today, still say that the reason that she was denied the Aspire Award that she had earned was because she's under investigation. Even today, and I pointed that out to counsel, that's been going on. What she's looking for, she has no career outside of HISD. HISD is the only place that she can go. She has been tainted and has been permanently tainted. The Aspire Award is available. I mean, any member of the public can simply do a FOIA request and find out that she is still considered in HISD's books to be under investigation. So you're asking for expungement of that in her record? You're asking for some kind of damages, but... We are asking for damages as well as expungement. We're asking that the clock be dialed back and that which was done to her be acknowledged and that she be given... First of all, she ought to be able to go back to Jefferson. She's not in a... And I realize that's not the issue that you're dealing with, whether or not she's in a place where that's desirable or not. But that was pointed out, I think, in another case. But she's asking for relief that should be available through the district court, and we ask that it be sent back to do that. You sort of caught me off at the end a little bit. And I guess that's the dessert, and I'll get back down to the entree. But you're saying she's denied the Aspire Award and she's been harmed in her reputation forever? Well, she had an adverse... The adverse action here is that she's been transferred to a place that... She was transferred two places. Who transferred her? Who determined... Who made the decision to transfer her? The only person that could make the decision to transfer her, according to the contract between HISD, Dr. Greer's Dr. Greer. He delegated his authority to, apparently, to then-Deputy Superintendent to Carla Luria. But we haven't been able to get in to develop a lot of these things. All we have is what we've been able to put together through some assiduous investigation on my part and on the part of Greg Grugan with FOX and some of the other people who've been able to do FOIA requests. Excuse me. Well, but, I mean, basically, you know, the defendant you have named is HISD and only HISD, right? You have not named Superintendent Greer individually, nor have you named the principal that she had in... And the reason for that is very clear. Superintendent Greer was a SUI generis superintendent at HISD, unlike any superintendent we've ever had. He had a contract that he entered into with HISD on September the 11th, 2009. Carol Galloway, the board member, was the district's representative and the signatory for the district. And that contract, Record on Appeal 334 and 339, as in paragraph 2.6, Exhibit 23, states, the board, by policy and by this contract, has delegated to the superintendent the authority to determine the terms of employment of all employees of the district except the superintendent. It then states also that the board delegated the authority to employ all contract and non-contract employees for positions authorized by the board, that means that have been budgeted, and to direct, assign, reassign, and transfer all employees in the manner which, in his judgment, best serves the district, subject to the guidelines established in the board policies. He was a sui generis superintendent. He even admitted as much when speaking on November the 14th of 2009, when he spoke to state representatives, when he spoke to the community in the 5th Ward, when he spoke to the established members of the ministerial alliance, and he said then that he had the contractual authority to make all decisions, and he was not going to be micromanaged by the board. So how would we, I mean, assume that we wanted to agree with you, I don't know how we're going to decide this case, but assume we wanted to agree with you when we were writing a published opinion, how would we deal with the very plain 5th Circuit authority that says that it's the board of trustees and not the superintendent that is the policymaker under Texas law? Well, for the concept of federalism, the Texas... Well, my point is that, excuse me, I'll give you a chance to answer, and I did cut you off, but what I'm asking is, we have case law on the books that's as clear as it possibly could be, and we're bound by that case law. We can't just go off and make exceptions. How would we write that in a coherent way? Case law also states that... Well, first of all, the state law says that the school board can delegate authority. It has the right to contract. That's what your case law is built upon. It's built on the concept that the school board is the administrative agency of the district, but the administrative agency of the district has the ability to contract. In this particular case, they did. They exercised a contract that the laws of the state of Texas gave them. One size doesn't fit all. I mean, this is a case where you say that in federal court, we have to look to state law. We have to say that the state's law governs what the authority of a policymaker is. In this particular case, I don't know that you're going to ever find another school district in Texas that does exactly what was done for Greer, but in this case, this school district, for whatever reason, they wanted him so badly that they gave up their absolute power in the areas of the contract, and the contract is before you in the record of this case. And precisely what did Greer do vis-a-vis this plaintiff? He called for an investigation, and when the investigation was completed, they concluded the investigation, but it was not Greer who personally transferred the plaintiff to the other school, right? Had to be Greer. So you're saying Greer, every single personnel decision made within HISD during the period in which Mr. Greer is superintendent is a policy of the district, and the district is therefore liable for it. Is that what you're saying? I mean, if you can raise a 1983 claim. I'm not sure exactly what the question is. If you can raise a 1983 claim. What I'm saying is that Greer has, first of all, he hired and fired at his whim. He could delegate that whim to other people. Well, they can all hire and fire, right? No. All the superintendents. No, no, superintendents in Texas can only hire and fire generally non-contractual employees. What they have to do is generally, by law, recommend, make recommendations to the board, and the board acts upon those recommendations. Greer didn't have to do that. He cut the middleman out. He was- He didn't hire or fire anybody here. All he did was call for an investigation, which you allege is retaliatory because this lady was an active member of the union, but she was investigated along with 18 other people. No, I'm not saying that the investigation was retaliatory in any other sense. What I'm saying is that what is retaliatory is that, and I think that's gonna be a substantive due process issue, but I think that, when I get to it, but the point is that if you look at the timeline, everything that happened after November the 15th, when she was perp-walked off the premises and placed in a field house to pick up trash, when she was taken out of her job function, everything that happened after that- Didn't they take all of the other teachers out of their job function during the course of the investigation? And they paid them at the end. Everybody got paid a year except for Elsa. Everybody got their Aspire Award except Elsa. Well, Aspire Award, that's a bonus, right? That's a performance bonus. Right. And everybody that performed at Jefferson, like Elsa, got their bonus. Everybody got a year's salary. The only difference between that- What does Mr. Greer have to do with whether she got the Aspire Bonus? He's the Ipsy Dixit ex cathedra, or was at that time, in determining who was paid, what they were paid. Basically, he worked through the HR. But I thought the Aspire Bonus was sort of a nominated thing. You thought it was- How did you qualify for an Aspire Bonus? Aspire Bonus is by performance of the school and the showing growth in the school. And I thought, didn't you say it was the new principal who she didn't like, or they didn't get along? Well, the new principal was found by the EEO office of the HISD to have violated the common core, the core principle of the HISD, common decency. That was not, by the way, Judge Smith, that was not a peril. When that was taken on appeal, I wanted to say this because of your comments in Godot, which I followed. The function, when the appeal was made by ELSA, by the way, it was not made up the chain of command, of the academic chain of command. It was made in sort of a segue to the EEO, governing the behavior of employees of the district, not the professional functions. I wanted to point that out, though, before I go. I did something wrong, I think. No, sir, I'm just, I'm trying not to interrupt you. Now, who gives this award? Is it the superintendent that decides who gets the award? The principal recommends, or? It's done, it's not, it's really done on more of a formula basis. It's an algorithm type of a basis that is supposed to have as little fingerprint on it as possible. It came in, the whole concept of. So the board does not get involved in giving this award? No, and frankly, I'm not even sure, I'm not even sure Spires is that realistic today, except they still carry it on the HISD website. I wanted to say also that the adverse action is a transfer. That's Godot, and that's also something that was pointed out in the Godot case by Sharp v. City of Houston, where it's well established, according to that court, that the purposes of a 1983 retaliation claim, adverse employment action can include a transfer. Now, you said that the board delegated to the superintendent the power to hire, that usually the board is the one that determines who gets hired. What about the responsibility of transfers? Is that something the board gets involved in, or is it up to the superintendent to determine transfers? Under Greer, everything was Greer's. Did you allege that? Yes, not only did I allege it, but I included it as the contract. I alleged it, repeated it. Council pointed out that I alleged it too much. Okay, well, you have time for rebuttal. Well, hopefully I can raise some of those issues that I didn't get to. Certainly. Thank you. Sure. Mr. Gilbert. Was there oral argument in the district court on this? No, Your Honor. B-6? No, Your Honor, there was not. May it please the court, my name is Chris Gilbert, and I have the honor to represent the Houston Independent School District in this appeal. This was a case that could have been a lot of things. It could have developed into a lot of different issues, but it didn't because the district filed a 12B-6 and Judge Bennett granted it, and that's why we have a fairly limited record in this appeal, although- Well, you want us to remand it for more development? No, Your Honor, I would prefer that you not do that. But what's interesting is the contract, and I would encourage you to read the contract. This is a Monell case, and there are lots of different ways, obviously, that you can find liability on behalf of a governmental entity. Where's the contract? Did he attach the contract to the complaint? Yes, Your Honor. He cited from it, I've got it right here. It's page 339. No, I'm sorry, it was not cited. It wasn't attached to the complaint, it was attached to his response to the 12B-6. Okay. There are a number of legal theories under Monell in which you can hold a governmental entity liable. Most of them are not at issue in this case because the board never took any action, and as Judge Smith noted, there is a legion of case law from this circuit stating that at least with regard to Texas school districts, the school board is the policymaker. That's Jett versus Dallas ISD, that's Barrow versus Greenville ISD. You can delegate, but to date, I'm not aware of any case that has ever actually found that at least with respect to school districts, that a school board actually delegated policymaking authority as opposed to decision-making authority to anyone, the superintendent or anyone else. That was the argument in Jett, and if you look at Jett, Jett talks about the difference between decision-makers and policymakers. Mr. Watts would have you believe that Terry Greer was some sort of unique and different superintendent. He was a superintendent of a school district, just like every other superintendent. Texas law actually makes the superintendent the final voice on a number of employment issues, including the issue of recommending terminations. That's the Barrow case, that's what they looked at in that case. But in both Jett and in Barrow, this court found that just because you have the final say on things like transfers, Jett is a transfer case, the superintendent in Jett, that's Dallas ISD, the superintendent in Jett had the absolute final say on making transfers. But this court found that wasn't a delegation of policymaking authority, that was simply a delegation of decision-making authority based on the fact that section 11.051 of the Education Code specifically says that it's the board, the school board, that has the authority and the ability to manage and govern Texas school districts. Barrow, which was decided in 2007, went back and looked at changes in the Education Code since then. There had been changes that had made it under state law more clear that the superintendent is the one who needs to be making employment recommendations. And Barrow said that doesn't, again, that's not evidence of the delegation of policymaking. Frankly, it's actually evidence that it is simply decision-making authority that's being delegated to the superintendent. Now, in this case, so there are two quotes that I want to read from Jett and Barrow, which I think are highly relevant, particularly in light of the questions that were asked before. In Jett, this court said that Papropnik similarly states that the authority to make municipal policy is necessarily the authority to make final policy when an official's discretionary decisions are constrained by policies not of that official's making. These policies, rather than the subordinate's departures from them, are the act of the municipality. And then in Barrow, 13, 14 years later, this court said similarly, an official whose discretionary decisions on a particular matter are final and unreviewable, meaning they can't be overturned, is constrained if another entity has ultimate power to guide that discretion, at least prescriptively, whether or not that power is exercised. That's what happened here. There are only seven factual allegations in the amended complaint that deal at all with Terry Greer and this alleged delegation of policymaking authority. The key ones, and the one that Mr. Watts cited in his argument, is this issue, and it is second to paragraph 11, the paragraphs started being renumbered, which was on page 112 of the record, in which he says, the plaintiff alleges, Terry Greer's contract with HISD, as described to and confirmed by HISD board member Carol Galloway, with Greer, in a telephone conversation on May 11th, 2011, stated the following. The board of trustees has delegated its authority to you. But you have to look at the contract. Now, Mr. Watts read you the important contact language, although kind of downplayed the final phrase, which is the key phrase in this. And again, this is the exact same paragraph, it's page 339 of the record, and it's paragraph 2.6 of the contract, which deals with employment of contract and non-contract employees. This says, this is the second half of the paragraph, it says specifically, the superintendent has been delegated the authority to employ all contract and non-contract employees for positions authorized by the board, and to direct, assign, reassign, and transfer all employees in the manner which, in his judgment, best serves the district, subject to guidelines established in policy by the board. That's the constraining language that both Jett and Barrow pointed to. Terry Greer did not have unlimited authority to do whatever he wanted to. He could make employment decisions subject to the guidelines established by policy by the board, it's in the contract. And this is the only thing that the appellant has pointed to as establishing an actual transfer of alleged policy-making authority. But it's clear in the contract it doesn't transfer policy-making authority. It only transfers decision-making authority, just like in Jett, and just like in Barrow. And must follow the policy adopted by the board. Exactly. So, again, if the superintendent does something else and goes against policy and makes employment decisions, that's the exact kind of respondent-superior liability that Monell said you can't attribute to a governmental entity. So I do think it's important to acknowledge, as the court did, that this was an investigation. I mean, that's what they were doing. They were looking to see whether anything happened here. A lot of the arguments that the appellant asserts in their brief are circular. The appellant argues that certain evidence was found as part of the investigation, and that that evidence proved that she couldn't have cheated on the exam, which is what we eventually found. And that that evidence, therefore, showed she never should have been part of the investigation, and therefore, somehow, it was sinister that she was. But that's what an investigation does. It finds evidence, and then decides, does this evidence show guilt, or does it show innocence? Mr. Watts, I'm not sure it matters, but just curious. He says that the records still show that she's under investigation. That is, he may be correct about that. That is an aspire, that's an internal thing that teachers can access to look at their aspire bonus, which the district doesn't do anymore. The aspire bonus has been the subject of other litigation that I'm not involved in, but it's my understanding that they're not going forward with that kind of bonuses anymore. It's an internal thing. I suppose if somebody did make a Public Information Act request for every record that ever had anything to do with his teacher, they might find that. It's highly unlikely, and I can't explain why my client hasn't fixed that. But the result of the investigation, and you've got that evidence is also in the record, very clearly shows that she was absolved and transferred to another school. So this was an investigation. It wasn't just her. It was actually about 19 people. And if you actually look at the memo, I think it was Judge Jones made a good point. Although the appellant keeps trying to blame Terry Greer for everything that happened in this, most of the allegations about Terry Greer, specifically in the complaint, are either about things that happened in a different case involving a principal named Mabel Caleb, which is not this case, different school, different, that he was more involved in. And then things that happened after the investigation was in full swing, when the union caused a lot of hullabaloo in the local media, and then people were responding to media requests. There are precious little allegations, very few, that say that Terry Greer had anything to do with selecting Ms. Gonzalez to be part of the investigation, placing her on leave, transferring her, or any of those things. In fact, the memo, and it's referenced a couple times in the brief, that actually started, this is the September 12, 2013 memo. It's page 390 of the record. This is the memo that started the investigation. Terry Greer's not part of this memo. This is from Carla Loria, who's the chief school officer for elementary schools, to Mark Smith, who was the head of the Office of School Support. So Terry Greer wasn't involved in that, even if you buy the delegation argument. Second of all, this memo doesn't have anything to do with the appellant. This memo actually doesn't identify any teachers. It simply says that there were concerns because there have been rumors among the parents that some teachers were helping kids cheat. There was one teacher who came forward and said she doesn't really have any proof, but she had heard some things in the halls. And then there was a concern that the passing rate was simply too high based on previous schools passing. How is that in the record? The plaintiff attached a lot of documents to the response to the 12B6. That's how this got on the record. But this is the memo that's actually cited several times, both in the brief and in the amended complaint. But again, this memo didn't have anything to do with Ms. Rodriguez. She wasn't actually identified until November, which is when the investigation went from sort of an earlier phase of was there cheating, is there a problem, do we even know who's involved, to now we think we know who's involved, we need to move forward. And in the record, it also shows, this is page 265 of the record, that the reason the plaintiff was involved as part of the investigation is she was identified by a student as having helped her cheat. Now apparently that student was ultimately wrong, that's the point of the investigation. But it wasn't Terry Greer who said, hey, let's make this person part of the investigation. She was identified as a student during the early part of the investigation. Moving on to substantive merits. Now Judge Bennett below resolved this case on Monell, and that was his only real ruling. But obviously this court, under previous precedent, can affirm the district court's ruling on a 12b-6 under any grounds that were asserted below and supported by the record. And we did move to dismiss on the merits, the First Amendment claim, the Liberty Interest claim, the Due Process claim, and the Equal Protection claim. And so I'll touch briefly on those. The First Amendment claim, if you look at the allegations, many of the allegations involving Ms. Rodriguez happened years before this incident at Jefferson Elementary School, at a different school, under different administrators, and there are no allegations that the people involved in this investigation even knew about any of those previous incidents that she had had. So there's a causation issue. We do believe, and we asserted below, that there was no adverse employment action. Mr. Watts is correct that transfers, under certain circumstances, can be considered an adverse employment action. But this court, in Burnside v. Kalen, said that those transfers are only adverse if they are objectively equivalent to a discharge, demotion, or reprimand. Ms. Rodriguez's transfer from Jefferson Elementary to Barrack Elementary, which is where she ended up, that's a teacher position in both schools. That's not objectively a demotion. With respect to the investigation, this court said in both Pierce v. Texas Department of Criminal Justice and Brough v. City of Garland that accusations, false allegations, and investigations are not adverse when, in the end, the person's absolved, which is what happened here. So we don't believe that there were really any adverse employment actions for purposes of the First Amendment complaint. There's a causation issue under the very fact causation's usually a fact issue, but if you look at the facts that are pled in this, there's a causation issue, both because many of the, as I said before, a lot of what happened that they allege happened, a lot of her alleged protected speech happened years before at a different school under different administrators. There's no allegation that any of the people involved in this investigation knew about all of that. More importantly, a lot of the protected speech that she alleges she engaged in was complaining about this investigation after November 15th. November 15th is when she was basically named to the investigation and transferred to the, I can't remember if it was the sports facility, when she was basically put on leave and put in the other place. All of that speech that happened after that couldn't have motivated her inclusion in the transfers backwards, the causations backwards. Nothing happened after that other than her being absolved, so there's no adverse employment action there either. Lastly, we don't believe that the allegations as put forward show that her speech was on a matter of public concern. Now, if you look carefully at what she alleges she said, there's a lot of allegations that the union was speaking out on various issues related to this overall investigation. There really aren't any allegations that the appellant did that. What she focuses on, and to the extent she did, it all happened after the investigation started and after she was transferred and put on essentially an administrative leave, it obviously couldn't have motivated, or couldn't have motivated, couldn't have caused any of that to happen. The main thing she focuses on is a grievance that she filed on September 10th, and that grievance, although the appellant sort of tries to make it seem like more than it was, you can tell from the allegations that that grievance was a grievance about her own medical restrictions. She had been on leave because of the car accident during the spring. When she came back in August, she had to move from one classroom to another. She asked for custodian help, and the principal said, no, you can't have custodian help. In fact, the allegation in the complaint is the principal said, nobody gets custodian help. So she filed a grievance saying, you're not paying any attention to my medical complaint. She actually called the administration building, and they called right over and said, no, give her help, and so she got help. That's the grievance. Complaints about not honoring one's own medical restrictions simply is not a speech on a matter of public concern under any of the tests that this court or the Supreme Court have used. And in fact, we cited a case, it's a district court case from New Mexico, West versus New Mexico Tax and Revenue Department, but that was the exact allegation and issue in that case. With respect to the liberty interest claim, this court, both the Supreme Court and this court have repeatedly held that an employee's liberty interest is affected only when the employee is discharged in a way that stigmatizes their reputation and forecloses them from other employment. That's Board of Regents versus Roth and Inree Selkrieg from this court. This court has repeatedly said that transfers are typically insufficient to create a liberty interest claim. Moore versus Ortero, Sheltia versus Wood. And in this case, she hasn't been, she wasn't discharged. She's still employed by the district to this day. And there's simply no, there aren't any allegations that would be sufficient to rise to a liberty interest violation. There are also no allegations that would rise to the level of a procedural due process violation. Again, public employees do not have property interests in specific assignments. That's Jett versus Dallas ISD again, and Thomas versus Smith. And being part of an investigation does not deprive an employee of property rights or require due process. That's what the Supreme Court held in SEC versus Jerry T. O'Brien, because the investigation itself doesn't result in final action. There would be something after that. In this case, if Ms. Rodriguez had been found to be part of, if she had been found to have cheated, which she wasn't, but if they had found that, then they would have had to go through the regular Chapter 21 process under the Education Code. She would have been entitled to a hearing. So in the SEC case, the Supreme Court said investigations don't require due process because in essence, they're a form of the due process. Lastly, equal protection. There's an equal protection claim asserted in this. The plaintiff failed to assert below or identify or allege what protected group she supposedly belonged to that supposedly motivated any of this, anything that happened to her, to the extent that what she's alleging is that she was part of the union. Membership in a teacher's organization does not involve a suspected class. That was the holding by the Sixth Circuit in Memphis AFT versus Board of Education of Memphis City Schools. For those reasons, unless the court has any other questions, I would be happy to yield a little bit of time back to the court. All right, I think you may. All right, thank you, Your Honors. Mr. Watts. First of all, I want to tell you, I'm not trying to put words or ask you to construe words. I think counsel's doing that. Look at Exhibit 23 of the contract. Look at the portion that he didn't read which says quite clearly, board by policy and by this contract has delegated to the superintendent the authority to determine the terms of employment of all employees of the district except the superintendent. I don't have to be Aristotle to figure out that what you're doing is giving the power to determine what the terms of relationships with the district are, that's called policy. The part that he says, the rest of it, which he would say is the key that would undo this Gordian knot that the board created for us, it does not say what Jett and Barrow said, and it does not, this case is totally distinguishable from Jett and Barrow. Secondly, he said that, you asked me what do I want? All I want the district to do is when they say something, demean it. I want government at the school district level or any governmental level, specifically at the state level, to demean what they say and say what they mean. If they write a word, know what they're writing, do it intelligently, for God's sakes, at least in a school district, and have it somewhere where it can be understood. He says that Caleb, that's not even this case. You know why I use Caleb? Because that's where Greer came in in 2009 and developed this plan with his lawyer's assistance, and he's been on it in steroids until he left last year. And so what is Caleb? In 12B6s, I can't take depositions. I did an ample and full discovery in 12B6, I mean in Caleb, and got depositions, and got testimony, and got affidavits, and you benefited from a lot of those. That's why I use Caleb's stuff, but because Caleb's statements by Greer, Caleb recorded the statements by Greer are relevant to what he interpreted his power to be, and that is what he, how he played the game. October 17th, he says, well, it just took a long time for us to figure out what the truth was. Well, the state law says that what you're gonna do if you're a superintendent, from the moment that you get some sort of idea, from the moment that you get a reasonable basis to conduct an investigation, that's the state law, then what you do is conduct the investigation, and you have seven days to get it all done. Why? Because people's lives and careers are important. And you have seven days to make that decision. But we didn't even know they were doing an investigation. None of the teachers knew they were, that Greer was doing an investigation, or through Carla Luria was doing an investigation, until November the 15th. We had heard something about parents coming up to the school, but we didn't know about it. So on November the 15th, we find out. We find out finally, later on, that on October the 17th, three kids in the third grade said that my teacher, Ms. Elsa Rodriguez, was there during, on the 23rd, the 24th of April, when they were star tested, and she couldn't have been there. She nearly died when she was hit by the drunk driver. She was out until June 13th, and she didn't get off medical disability with the restrictions until later in the fall. On October the 17th, their investigators knew that Elsa Rodriguez wasn't there on the 23rd and 24th. Well, that's when they said, well, maybe it's possible, look at Suazo's affidavit. He says, well, that's true, but maybe it's possible that she could have come into the fifth grade on April 2nd or 3rd, and not her class, she taught third, remember? That she could have come into the fifth grade, and she could have cheated there. Well, and unfortunately for them, which they haven't talked to you about, and they haven't put anything in there brief about, in order for a teacher to go into a testing situation, they have to have the assignment by the principal, the assignment by the testing director, and if any teacher goes into a classroom, they're on video camera, because all the schools have security cameras. All they had to do, they never talked to the principal at that time, Kerry Hamilton, I did, I got an affidavit from him. They never talked to Patrick Stapleton, the testing director, I did, I got a questionnaire and affidavit from him, and they never looked at the video cameras. I couldn't do that. They knew on October the 17th that my lady was not involved, but they drug it out. They kept her in the field house, picking up trash until the end of the school year. What do I want? I'd like to see fair play, just basic fair play. All right, sir, we have no argument. Thank you very much. We'll be in recess until nine.